## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **SONIA F.G.,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**FRANK BISIGNANO,  Commissioner of Social Security,**<br><br>    **Defendant.** | **Case No. 24-1192-JAR** |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court for review of the final decision of Defendant Commissioner of Social Security[1] denying Plaintiff's application for disability and disability-insurance benefits under Title II of the Social Security Act.  Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in failing (1) to properly evaluate her treating provider's medical opinion that she needed to elevate her legs three to four times a day for 30 minutes and (2) to include that limitation in her residual functional capacity ("RFC").  Because the Court concludes that the ALJ failed to properly evaluate this medical opinion, the Court reverses and remands the Commissioner's decision.

## I.    Procedural History

On August 19, 2022, Plaintiff prospectively applied for a period of disability and disability-insurance benefits, alleging a disability onset date of September 28, 2016, which she later amended to August 29, 2019.  Plaintiff's applications were denied initially and upon reconsideration.  After a hearing, the ALJ issued a decision that Plaintiff was not disabled.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025.

Plaintiff's request for review by the Appeals Council was denied. Thus, the ALJ's January 16, 2024, decision became the final decision of the Commissioner.

Plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal of the ALJ's decision and remand for a new administrative hearing. Because Plaintiff has exhausted all administrative remedies available, this Court has jurisdiction to review the decision.

## II.      Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether the Commissioner's decision is supported by substantial evidence in the record as a whole and whether the Commissioner applied the correct legal standards.[2] The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[3] In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[4]

## III.     Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[5]

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[2] *See Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015).

[3] *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001) (quoting *Castellano v. Sec'y of Health & Hum. Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).

[4] *Id.*

[5] 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(a).

engage in any other kind of substantial gainful work which exists
in the national economy . . . .[6]

Pursuant to the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.[7]  The steps are designed to be followed in order.  If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary.[8]

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe impairment or combination of severe impairments; and (3) whether the severity of those impairments meets or equals a designated list of impairments.[9]  "If the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's RFC, which is [the claimant's] ability to do physical and mental work activities on a sustained basis despite limitations from her impairments."[10]

Upon assessing the claimant's RFC, the Commissioner moves on to steps four and five. Step four requires the Commissioner to determine whether the claimant can perform her past relevant work, and step five calls for assessment of whether she can generally perform other work that exists in the national economy.[11]  The claimant bears the burden in steps one through

---

[6] *Id.* § 423(d)(2)(A).

[7] *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2025).

[8] *Barkley v. Astrue*, No. 09-1163, 2010 WL 3001753, at *2 (D. Kan. July 28, 2010).

[9] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (first quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); and then quoting *Williams v. Brown*, 844 F.2d 748, 751 (10th Cir. 1988)); *see also Barkley*, 2010 WL 3001753, at *2 (citing *Williams*, 844 F.2d at 751).

[10] *Barkley*, 2010 WL 3001753, at *2 (citing 20 C.F.R. § 416.920(e) (2010)); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545 (2025).

[11] *Barkley*, 2010 WL 3001753, at *2 (citing *Williams*, 844 F.2d at 751).

four to prove a disability that prevents performance of her past relevant work.[12]  The burden then

shifts to the Commissioner at step five to show that, despite the claimant's alleged impairments,

the claimant could perform other work in the national economy.[13]

The ALJ determined at step one that Plaintiff had not engaged in substantial gainful

activity during the period from the amended onset date of August 29, 2019, through her date last

insured of December 31, 2021.

The ALJ determined at step two that Plaintiff had the following severe impairments:

rheumatoid arthritis, osteoarthritis of the bilateral knees, deep venous/thrombosis/insufficiency

and varicose veins of the lower extremities, bilateral carpal tunnel syndrome, diabetes mellitus

and obesity.  He also found that Plaintiff had the following non-severe impairments:

hypertension, hiatal hernia, GERD, restless-leg syndrome, insomnia, and depression.

At step three, the ALJ found that Plaintiff's impairments did not meet or equal the

severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, or 404.1526.

Continuing, he determined that Plaintiff had the RFC to

> perform light work as defined in 20 CFR 404.1567(b), in that the
> claimant can lift and carry up to twenty pounds occasionally and
> lift or carry up to ten pounds frequently; stand and/or walk for six
> hours out of an eight-hour workday; and sit for six hours out of an
> eight-hour workday.  The claimant should never climb ladders,
> ropes and scaffolds; and can occasionally climb ramps and stairs,
> stoop, kneel, crouch, crawl, and balance as defined by the SCO.
> The claimant can frequently handle bilaterally.  The claimant can
> occasionally use foot controls bilaterally.  The claimant should
> never work at unprotected heights or with moving mechanical
> parts; and can occasionally work in vibration.  The claimant can
> never tolerate exposure to wetness, humidity, fumes, odors, dusts,
> gases, poor ventilation and pulmonary irritants beyond a level

---

[12] *Lax*, 489 F.3d at 1084 (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005)).

[13] *Id.* (quoting *Hackett*, 395 F.3d at 1171).

found in an indoor work environment such as an office or retail store; and occasionally extreme cold and extreme heat.[14]

The ALJ determined at step four that Plaintiff could not perform past relevant work as a cashier checker. But after considering Plaintiff's age, education, work experience, and RFC, he found that Plaintiff could perform other jobs that existed in significant numbers in the national economy. Thus, the ALJ concluded that Plaintiff had not been under a disability from August 29, 2019, through December 31, 2021.

## IV.    Discussion

Plaintiff asserts that the ALJ erred in evaluating APRN Paul Murphy's medical opinion that she needs to elevate her legs three to four times a day for 30 minutes at a time, which was not accounted for in the ALJ's RFC determination. A vocational expert testified that a hypothetical claimant who needed to elevate her legs four times per day, for even 15-minute intervals, would be incapable of maintaining competitive employment.[15] The ALJ found that limitations beyond what he determined in the RFC

> are not supported by the medical record including treating notes showing that showing the claimant had a functional gait, was able to get in and out of the examination table without any difficulty, could stand on her toes/heels, had a normal straight leg raise . . . moved all extremities without difficulty, normal motor function, no focal deficits and in no distress . . . had 5/5 power in upper and lower extremities . . . and the testimony of the claimant that she could lift 20 pounds, stand 20 minutes at one time, walk 20-30 minutes, swept/vacuumed, did laundry, prepared meals, drove and went to the store 4 times a week.[16]

The ALJ discredited as subjective and not persuasive Plaintiff's complaints that her symptoms limited her ability to ambulate and walk longer distances or do errands and chores due to pain and fatigue. The ALJ further found that APRN Murphy's "recommendation . . . that the

---

[14] Doc. 7-3 at 16.

[15] *Id.* at 58.

[16] *Id.* at 20.

claimant was to continue daily use of compression stockings and elevate legs nightly and 3-4 times daily for 30 minutes were temporary and not persuasive."[17]

Defendant Commissioner argues that APRN Murphy's statement was duly considered by the ALJ as other medical evidence, but because it was not a medical opinion the ALJ did not need to evaluate the statement as such.    Under the agency's revised regulations, for claims like Plaintiff's that are filed on or after March 27, 2017, a "medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in"[18] "[y]our ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)."[19]   A medical opinion does not include "judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."[20]   Rather that information is "other medical evidence" under the regulation.[21]

While there is no dispute that APRN Murphy is a "medical source," the parties disagree about whether APRN Murphy's statements about Plaintiff's need to elevate her legs are properly characterized as a medical opinion or as other medical evidence.   Defendant argues this is other

---

[17] *Id.*

[18] 20 C.F.R. § 404.1513(a)(2) (2025).

[19] *Id.* § 404.1513(a)(2)(i).

[20] *Id.* § 404.1513(a)(3).

[21] *Id.*

medical evidence, in that this is a statement of prescribed treatment, addressed in the medical source's "Patient Instructions"[22] or "Assessment/Plan."[23]

Plaintiff argues that these statements about the need to elevate her legs are about an impairment-related postural restriction, because her ability to stand or walk is impaired while her legs are elevated.   Plaintiff points out that the ALJ evidently considered Murphy's statement a medical opinion, for he addresses it in the medical opinion section of his opinion and refers to it as a "recommendation."[24]   To be clear, the ALJ explicitly refers to the opinions of the state-agency medical consultant and state-agency psychological consultant as opinions, while referring to Murphy's statement as a recommendation.[25]   But he also concludes that Murphy's recommendation is not "persuasive," which is the evaluation required of medical opinions.[26]   In any case, the ALJ's characterization of Murphy's statement is not dispositive of whether it is a medical opinion.

Plaintiff points to cases that characterize an instruction or recommendation to elevate one's legs as a medical opinion.   Defendant argues that to the extent these cases concern claims predating March 27, 2017, they are inapposite.   For the agency changed its definition of "medical opinion" for claims filed on or after that date.   For claims filed before March 27, 2017, medical opinion was defined as "statements from acceptable medical sources that reflect judgment about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical and mental restrictions."[27]   But for

---

[22] *See, e.g.*, Doc. 7-9 at 339.

[23] *See, e.g., id.* at 263–64.

[24] Doc. 7-3 at 20.

[25] *Id.*

[26] *Id.*

[27] 20 C.F.R. § 404.1527(a)(1) (2025).

claims filed on or after March 27, 2017, statements about the nature and severity of impairments, symptoms, diagnosis, and prognosis are considered "other medical evidence," not "medical opinions."[28] Moreover, for claims filed on or after March 27, 2017, statements about prescribed treatment are not medical opinions.[29]

Given the requirement that medical opinions be statements addressing physical limitations or restrictions, the Court necessarily focuses on the substance, not just the form, of the medical source's statements. The fact that the statement is in a section entitled "prescribed treatment" or "treatment plan" does not preclude the possibility that it is a medical opinion.

While the parties cite cases addressing what constitutes a medical opinion, many of these cases do not involve statements about the need to elevate one's legs, and thus are not particularly helpful in analyzing whether such statements are about prescribed treatment, postural and functional limitations, or both.[30]

When viewed without context, medical source statements about the need to elevate one's legs could certainly be viewed as statements of prescribed treatment. On the other hand, elevating one's legs obviously may affect several postural or functional abilities, including standing and walking.

Two cases concerning a claimant's need to elevate his or her legs are particularly instructive. In *Glasco-Parish v. Kijakazi*,[31] the court considered statements of two medical sources who stated that the claimant needed to elevate his legs. One statement, the court held, was *not* a medical opinion because the medical source stated that claimant needed to elevate his legs "when

---

[28] *Id.* § 404.1513(a)(1).

[29] *Id.* § 404.1513(a)(3)/

[30] *See, e.g.*, *Wilson v. Saul*, No. 19-1096, 2020 WL 569823 (D. Kan. Feb. 5, 2020) (plaintiff); *Staheli v. Comm'r*, 84 F.4th 901, 905 (10th Cir. 2023) (defendant).

[31] 2023 WL 375376 (W.D. Okla. Jan. 24, 2023).

at rest." This did not indicate a need to elevate his legs during the workday. In contrast, the court held that the other medical source's statement was a medical opinion because that source stated that the claimant needed to elevate his legs and did not limit it to times when claimant was at rest, thus implicating his workday and amounting to a restriction on his ability to perform the physical demands of work.[32]

Similarly, in *Morris v. Kijakazi*,[33] the court found that the medical source's recommendation that the plaintiff should elevate her feet "when resting" was not a medical opinion because the recommendation applied to periods when the plaintiff was resting, not working. Furthermore, there was no indication that this recommendation "lasted for any particular duration, let alone into the period relevant to this case" and nothing suggested that the recommendation lasted for 12 consecutive months.[34] In other words, the court found nothing suggesting that the recommendation was anything more than a temporary measure "to ease or cope with physical pain or injury" and nothing to suggest that it affected the plaintiff's ability to engage in work-related activities.[35]

Here, APRN Murphy's statements about Plaintiff's need to elevate her legs surely can be characterized as prescribed treatment, but when considered in context, they are also medical opinions in that they are statements about physical, postural restrictions during the workday. First, APRN Murphy did not limit this recommendation to times when Plaintiff is at rest. Notably, in a treatment note dated March 17, 2021, the second time Plaintiff was seen at the Vein Clinic, Plaintiff reported that her symptoms were worse in the afternoon and evenings, that her symptoms

---

[32] *Id.* at *4–5.

[33] 2023 WL 8096887 (D. N.M. Nov. 21, 2023).

[34] *Id*. at *15.

[35] *Id.*

improved somewhat with leg elevation overnight and that at that point she was not elevating her legs during the day.[36]  APRN Murphy instructed her to elevate her legs for at least 30 minutes, three to four times a day.[37]  It is clear from the context of that treatment record, that Murphy was instructing Plaintiff to elevate her legs during the day, not just at night.  Murphy's treatment note on August 24, 2021, was more explicit: "[i]nstructed continue daily use of compression stockings, and elevate legs nightly and 3-4 times a day for 30 minutes."[38]

Furthermore, Murphy instructed her to "avoid prolonged period of standing or sitting with your legs dependent or dangling."[39]  This statement thus represented postural restrictions on standing and walking, both of which would be impossible to accomplish during periods when she was elevating her legs.

Moreover, the ALJ erred in finding that APRN Murphy's recommendation to elevate her legs was temporary.[40]  Murphy examined Plaintiff on seven occasions, from March 27, 2021, to May 2, 2022.[41]  Throughout the course of more than 12 months of treatment, Murphy consistently instructed Plaintiff to elevate her legs three to four times a day, for 30 minutes at a time, and to avoid prolonged periods of standing or sitting with her legs dependent or dangling.[42]

During this course of treatment, when Plaintiff did not experience a lasting improvement in her symptoms, Plaintiff's medical providers moved from conservative treatment—compression

---

[36] Doc. 7-9 at 109–10.

[37] *Id.* at 338.

[38] *Id.* at 265.

[39] *Id.* at 339.

[40] Doc. 7-3 at 20.

[41] The relevant period was August 29, 2019 (the amended onset date), to December 31, 2021 (the date last insured).  Murphy saw Plaintiff in 2021 on March 17, June 17, July 7, August 10, August 24, October 20, November 15; and in 2022, on March 10 and May 2.

[42] Doc. 7-9 at 339, 297, 265, 235, 166, 115.

socks and intermittent elevation of her legs—to more aggressive treatment.    Plaintiff had three radiofrequency ablation procedures in August, October, and November 2021,[43] and sclerotherapy in May 2022.[44]    Radiofrequency ablation is a minimally invasive technique that uses radiofrequency waves to shrink the size of tumors, nodules, or other growths; it is used to treat a range of conditions including chronic venous insufficiency.[45] Sclerotherapy is a minimally invasive treatment for varicose veins involving the injection of a chemical solution into the vein to close it off.[46]

Despite receiving this more aggressive treatment, Plaintiff continued to report painful veins and other symptoms, and APRN Murphy continued to give Plaintiff the exact same instructions about elevating her legs and avoiding prolonged standing or sitting.    For all of these reasons, this Court finds that APRN Murphy's statements were medical opinions.

Several regulations govern the ALJ's review of medical opinions.[47]    When evaluating medical opinions, these regulations provide that the agency will consider certain factors, including the supportability, consistency, relationship with the claimant, physician's specialization, and other factors.[48]    The most important factors in evaluating the persuasiveness of a medical opinion or prior administrative medical finding are supportability and consistency.[49]    Under the supportability factor, "[t]he more relevant the objective medical evidence and supporting

---

[43] Doc. 7-9 at 200, 109–10.

[44] *Id.* at 109–10.

[45] *See Radiofrequency Ablation,* Johns Hopkins Med., https://hopkinsmedicine.org/health/treatment-tests-and-therapies/radiofrequency-ablation (last visited May 27, 2025).

[46] *See Sclerotherapy*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/6763-sclerotherapy (last visited May 27, 2025).

[47] *See* 20 C.F.R. §§ 404.1520c, 416.920c (2025).  *See Bills v. Comm'r*, 748 F. App'x 835, 838 n.1 (10th Cir. 2018) (noting the revised regulations apply to claims filed on or after March 27, 2017).

[48] 20 C.F.R. § 404.1520c(a), (c)(1)–(5) (2025).

[49] *Id.* § 404.1520c(a).

explanations presented by a medical source are to support [the] medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."[50]   As to the consistency factor, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."[51]

The ALJ did not properly evaluate APRN Murphy's medical opinion; he did not address the key factors of supportability and consistency.   Instead, he referenced only one of APRN Murphy's treatment notes and made the erroneous finding that this recommendation was "temporary, and the cursory finding that it was not persuasive.[52]

For these reasons, the Court reverses and remands this case to the Commissioner for further proceedings.

**IT IS THEREFORE ORDERED BY THE COURT** that the Commissioner's decision denying Plaintiff disability benefits is **REVERSED AND REMANDED under Sentence Four of 42 U.S.C. § 405(g).**

**IT IS SO ORDERED.**

Dated: May 28, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[50] *Id.* § 404.1520c(c)(1).

[51] *Id.* § 404.1520c(c)(2).

[52] Doc. 7-3 at 20.